1   Tarek H. Zohdy (SBN 247775)
    Tarek.Zohdy@capstonelawyers.com
2   Cody R. Padgett (SBN 275553)
    Cody.Padgett@capstonelawyers.com
3   Laura E. Goolsby (SBN 321721)
    Laura.Goolsby@capstonelawyers.com
4   Capstone Law APC
    1875 Century Park East, Suite 1000
5   Los Angeles, California 90067
    Telephone:    (310) 556-4811
6   Facsimile:    (310) 943-0396

7   Russell D. Paul (*pro hac vice forthcoming*)
    Amey J. Park (*pro hac vice forthcoming*)
8   Abigail J. Gertner (*pro hac vice forthcoming*)
    Berger Montague PC
9   1818 Market Street, Suite 3600
    Philadelphia, PA 19103
10  Tel: (215) 875-3000
    Fax: (215) 875-4604
11

12  Attorneys for Plaintiffs

13              UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15  KEVIN MOORE and ANITA MOORE,          Case No.:
    individually, and on behalf of other members
16  of the general public similarly situated,     **CLASS ACTION COMPLAINT FOR:**

17              Plaintiffs,                (1)   Violations of California's Consumers
                                                 Legal Remedies Act
18          v.                            (2)   Violations of California's Unfair
                                                 Competition Law
19  AMERICAN HONDA MOTOR CO., INC.,       (3)   Violations of California's Song-Bervely
    a California corporation, and HONDA         Consumer Warranty Act;
20  MOTOR COMPANY LTD., a Japanese        (4)   Breach of Express Warranty under
    corporation,                                California Law;
21                                        (5)   Breach of Express Warranty under the
                Defendants.                     Magnuson-Moss Warranty Act
22                                        (6)   Breach of Implied Warranty under the
                                                 Magnuson-Moss Warranty Act
23                                        (7)   Fraudulent Concealment/Omission; and
                                          (8)   Unjust Enrichment
24

25                                        **DEMAND FOR JURY TRIAL**

26

27

28

**INTRODUCTION**

1.       Plaintiffs Kevin Moore and Anita Moore bring this action for themselves and on behalf of all Class Members, *i.e.*, all current and former owners or lessees who purchased or leased any Honda vehicle equipped with a 9-speed automatic transmission ("ZF 9HP" or "9-speed A/T") (collectively, "Class Vehicles") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by American Honda Motor Co., Inc., ("AHMC") and Honda Motor Company Ltd. ("HMC")  (collectively "Defendants").[1] Plaintiffs allege as follows:

2.       This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.       In 2014, faced with increasing United States Corporate Average Fuel Economy standards, Honda began equipping select vehicle models with a 9-speed "automatic" transmission designed to increase fuel economy. Unfortunately, due to the Transmission Programming Defect described below, the new transmission came at a significant and undisclosed cost: rough and delayed shifting, loud noises during shifting, harsh engagement of gears, sudden, harsh accelerations and decelerations, and sudden loss of power.

4.       "Instinctively responsive," "firmly planted," and "incredibly nimble" is how Mike Accavitti, a former vice president at AHMC, characterized the ZF 9HP Transmission when it was first released in vehicles distributed, marketed, and sold by American Honda Motor Company, Inc., in 2014. However, the 2015 vehicles hit the market with reviews critical of the ZF 9HP Transmission. A journalist from Road & Track Magazine noted that the ZF 9HP Transmission "uses an electronic shifter…[that] takes an eternity to engage drive, its shifts are clunky, and it's painfully slow to react to manual commands."[2]

5.       The ZF 9HP Automatic Transmission's unique 9.8 ratio spread and computer-

---

[1] Vehicles equipped with the ZF 9HP transmissions (the "Class Vehicles") include the 2016-2022 Honda Pilot; 2018-2019 Honda Odyssey; 2019–present Honda Passport; and 2020–present Honda Ridgeline.

[2] Jason Cammisa, *11 things you need to know about the 2015 Acura TLX*, Road & Track Magazine (Aug. 5, 2015), http://www.roadandtrack.com/new-cars/news/a6338/2015-acura-tlx-first-drive-review/ (last visited September 27, 2023).

controlled shifting were marketed as a significant technological advancement from previously employed six-speed automatic transmissions and were claimed to have better performance and fuel economy while maintaining the ease of use of traditional automatic transmissions.[3]

6.      Plaintiffs, as the result of investigation and their own experiences, and based thereon allege, that the Class Vehicles equipped with the ZF 9HP Automatic Transmission contain design and/or workmanship defects in that there is improper design and/or calibration of the software in control of the transmission, including the Transmission Control Module and the Powertrain Control Module (the "Transmission Programming Defect" or the "Defect"). In the Class Vehicles, the functioning of the transmission is controlled by a Transmission Control Module ("TCM"), and the interaction of the TCM with the Engine Control Module is controlled by a Powertrain Control Module ("PCM"). While components like the transmission are delivered by a component manufacturer with the software programmed, it is the responsibility of the vehicle manufacturer, like Honda, to ensure that the software is properly calibrated for use in its vehicles, particularly in the manner in which the TCM communicates with other modules such as the PCM, and in the manner in which the TCM addresses and responds to sensor data. With respect to the sensor data, due to this miscalibration, the TCM and PCM can become unduly sensitive to variations in signals coming from the sensors that communicate with the TCM and PCM. For example, this can result in, *inter alia,* an abnormal torque calculation which, in turn, causes an incorrect throttle response when the transmission is shifting gears, which can result in harsh shifts, delayed shifts, and unexpected shifts (also referred to as gear-hunting). Overall, due to the Transmission Programming Defect, the TCM does not communicate properly with the PCM and respond correctly to incoming sensor data, and as a result, gear shifting, among other functions, is mistimed. The Transmission Programming Defect thus causes the transmission to exhibit the following: illumination of the Malfunction Indicator Light ("MIL"), rough, delayed, or sudden

---

[3] "The new 9-speed is substantially lighter…with a wider overall ratio range and more closely spaced individual gear ratios to enhance both performance and fuel efficiency." Acura, *2015 Acura TLX: Overview Press Release* (Aug. 4, 2014), https://beta.acuranews.com/en-US/releases/release-256ffda523f6471f8c4a5016507582f1-2015-acura-tlx-overview          (last visited September 27, 2023).

shifting or failure to shift; grinding or other loud noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; and sudden loss of power.

7.     Traditional automatic transmissions use a set of gears that provides a given number of ratios. The transmission shifts between gears to provide the most appropriate ratio for a given situation. Normally, that means the transmission will automatically shift into lower gears for starting, middle gears for acceleration and passing, and higher gears for more fuel-efficient cruising.  The ZF 9HP Automatic Transmission differs from traditional automatic transmissions in that it employs a 9.8 ratio spread, as opposed to 6, ideally allowing for shorter shifts between gears keeping the engine in a narrow, optimal band of RPMs for as long as possible, and contributing to greater fuel-efficiency. Additionally, the ZF 9HP Automatic Transmission borrows characteristics typically seen in manual transmissions, such as "dog clutches," which use less power to shift than the friction clutches normally utilized in automatic transmissions. However, in contrast to manual transmissions, the ZF 9HP Automatic Transmission engages the dog clutches with computer software commands from an electronic control unit in order to save space and ensure that the complex transmission actually fits inside the vehicles. Automotive journalist Alex L. Dykes clearly explained the result of employing the software, writing:

> The 9HP's software…[unlike other automatics] responds by cutting power initially, then diving as far down the gear-ladder as it can, engaging the dog clutches and then reinstating your throttle command.  The result is a somewhat odd delay between the pedal on the floor and the car taking off like a bat out of hell.[4]

8.     A vehicle equipped with an automatic transmission should function in a manner that the driver expects; *i.e.,* it should start, accelerate, decelerate, and stop immediately in response to the driver's input. In practice, however, due to the presence of the Transmission Programming Defect, the Class Vehicles equipped with the ZF 9HP transmission operate erratically, causing numerous safety concerns.

9.     The Transmission Programming Defect causes unsafe conditions, including, but not limited to, delayed acceleration, abrupt forward propulsion, and sudden loss of power, which

---

[4] *See* Alex L. Dykes, *ZF's 9-Speed 9HP Transmission Puts Dog Clutches On The Leash,* The Truth About Cars (Feb. 8, 2014), http://www.thetruthaboutcars.com/2014/02/zfs-9-speed-9hp-transmission-puts-dog-clutches-on-the-leash/ (last visited September 27, 2023).

are hazardous because they severely affect the driver's ability to control the car. For example, these conditions may make it difficult to change lanes safely, make turns, merge into traffic, and accelerate from stop at intersections, because Class Members' vehicles can fail to respond correctly to driver's input during these normal traffic conditions.

10.     Discovery will show that Defendants' corporate officers, directors, or managers knew about the Transmission Programming Defect and failed to disclose it to Plaintiffs and Class Members at the time of sale, lease, repair, and thereafter.

11.     Discovery will also show that the Class Vehicles utilize the same or substantially identical ZF 9HP Automatic Transmissions, and the Transmission Programming Defect is the same for all Class Vehicles.  Furthermore, the same or substantially identical ZF 9HP Automatic Transmission was installed in previous Honda-produced Acura vehicles, and also suffered from the same Defect.

12.     As a result of the Defect, AHMC issued a service campaign and multiple Technical Service Bulletins ("TSBs") to its dealers in the United States, acknowledging defects and/or symptoms of the Transmission Programming Defect in the ZF 9HP Automatic Transmission and attempting to address them. These service bulletins and campaigns, as written by HMC and distributed by AHMC, are discussed more fully *infra*.

13.     However, in the Class Vehicles, discovery will show that these purported remedies are insufficient to correct the Transmission Programming Defect,  and consumers continue to experience problems with their vehicles, despite the purported fixes, including: rough, delayed, or sudden shifting or failure to shift; grinding or other loud noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; and sudden loss of power.

14.     Despite knowledge from numerous consumer complaints, dealership repair orders, and TSBs, neither AHMC nor HMC have issued a warranty extension for the Class Vehicles, have recalled the Class Vehicles to repair the Transmission Programming Defect, or have offered their customers a suitable repair or replacement free of charge.

15.     Because neither AHMC nor HMC will not notify Class Members that the ZF 9HP Automatic Transmission is defective, Plaintiffs and Class Members (as well as members of the

general public) are subjected to potentially dangerous driving conditions that can occur without warning.

16.     The alleged Transmission Programming Defect was inherent in each Class Vehicle and were present in each Class Vehicle at the time of sale.

17.     AHMC and HMC had exclusive and superior knowledge about and failed to disclose the Transmission Programming Defect present in every Class Vehicle, along with the attendant dangerous safety problems, from Plaintiffs and Class Members, prior to the time of sale, lease, repair, and thereafter. In fact, instead of repairing the defects in the ZF 9HP Automatic Transmission, AHMC performed work on the Class Vehicles, such as software updates, that simply masked the defects.

18.     For instance, the Transmission Programming Defect has plagued the Fiat Chrysler 2014 Jeep Cherokee equipped with the ZF 9HP Automatic Transmission since it was first introduced to the U.S. market. In fact, after several transmission-related delays of the Cherokee's release, Sergio Marchionne, CEO of FCA US, told Automotive News that "[w]e have had to do an inordinate amount of intervention" on  the ZF 9HP Automatic Transmission to correct problems with the transmission software.[5] Before ACHM and HMC's release of the Class Vehicles, over a hundred Jeep Cherokee owners filed complaints with the National Highway Traffic Safety Administration ("NHTSA"),[6] and FCA had already issued three TSBs relating to problems with the ZF 9HP Automatic Transmission.[7]  Discovery will show AHMC and HMC were aware of the Transmission Programming Defect through their analysis of the ZF 9HP Automatic Transmission's prior application and use by other manufacturers, and by AHMC and

---

[5] *See* Larry P. Vellequette, *Another fix for Jeep's troubled 9-speed,* Automotive News (Feb. 2, 2015), https://www.autonews.com/article/20150202/OEM01/302029930/another-fix-for-jeep-s-troubled-9-speed (last visited September 28, 2023).

[6] *Id.*

[7] FCA issued TSB 21-013-13 on or around November 14, 2013, instructing dealers to evaluate and identify "poor shift quality" if 2014 Jeep Cherokee owners "indicate that their transmission shift quality does not meet their expectations."  FCA then issued TSB 21-014-13 on or around December 19, 2013, instructing dealers to reprogram the TCM to cure "Inconsistent and/or harsh" 1-2 and 2-3 upshifts. Further, FCA issued TSB 21-018-14 on or around May 15, 2014, which superseded the previous TSB and instructed dealers to perform a software update to cure a number of transmission malfunctions.

HMC's own use of the ZF 9HP Automatic Transmission in predecessor vehicles, including the Acura TLX, beginning with the 2015 model year, and the Honda Pilot, beginning with the 2016 model year.

19.     If they had known about the Transmission Programming Defect at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

20.     Both HMC and AHMC had a duty to disclose the Transmission Programming Defect, given that both entities knew of the Transmission Programming Defect at the time of sale and failed to disclose this defect to the consumers. HMC designed and manufactured the vehicles, AHMC distributed, warranted, and sold the vehicles through its network of authorized dealerships, and both entities put these vehicles into the stream of commerce.

21.     As a result of their reliance on AHMC and HMC's omissions, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and value of their Class Vehicles. Additionally, as a result of the Transmission Programming Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail or require replacement or repair before their expected useful life has run.

**PARTIES**

**Plaintiffs Kevin and Anita Moore**

22.     Plaintiffs Kevin and Anita Moore are California citizens who reside in Pleasant Hill, California.

23.     On or around February 27, 2018, Plaintiffs Moore purchased a new 2018 Honda Odyssey from Walnut Creek Honda, an authorized Honda dealership in Walnut Creek, California.

24.     Plaintiffs Moore purchased their vehicle primarily for personal, family, or household use. Honda manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

25.     Passenger safety and reliability were important factors in Plaintiffs Moore's

decision to purchase their vehicle. Before purchasing their vehicle, Plaintiffs Moore spent time researching the Honda Odyssey online, including on both the Honda website and the Honda dealership's website. Additionally, at Walnut Creek Honda, Plaintiffs Moore reviewed the vehicle's Monroney sticker (a.k.a., the window sticker), and spoke with an employee of the authorized Honda dealership regarding the 2018 Honda Odyssey's features, including the 9HP transmission with which it was equipped. Plaintiffs Moore believed that the Honda Odyssey would be a safe and reliable vehicle.

26.     Had AHMC or HMC disclosed their knowledge of the Transmission Programming Defect before Plaintiffs Moore purchased their vehicle, Plaintiffs Moore would have seen such disclosures and been aware of them. Indeed, AHMC's and HMC's omissions were material to Plaintiffs Moore.  Like all members of the Class, Plaintiffs Moore would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Transmission Programming Defect

27.     On or around November 17, 2021, with approximately 71,000 miles on the odometer, the Moores began experiencing the Defect. Specifically, their vehicle's transmission began bucking and lagging when accelerating from a stop or when going under 40mph. Plaintiffs Moore brought their vehicle to Mekatron Premier Auto Service, an automobile repair shop located in Concord, California, for diagnosis. Mekatron recorded the Moores' complaint as "transmission hesitates on hard acceleration" but was unable to find the problem or perform any repairs. Despite this lack of repair, Plaintiffs Moore were forced to pay $218.00 out of pocket for the attempted diagnosis.

28.     Despite this ostensible diagnosis, Plaintiffs Moore continued to experience the Defect and feel unsafe in the vehicle. The delayed acceleration presents a safety defect at intersections, because, for example, Plaintiffs Moore cannot predictably accelerate their vehicle when turning left across oncoming traffic. These symptoms worry Plaintiffs Moore, particularly at intersections.

29.     On or around July 7, 2023, the transmission bucked, lagged, illuminated a warning light, shifted into neutral without driver input, and prevented the vehicle's drive gear

from being engaged.

30.     On or around July 10, 2023, with the problems continuing, Plaintiffs Moore brought their vehicle to Walnut Creek Honda where Honda technician's verified the Moore's complaint, found "the transmission had internal gear failure," and replaced the transmission and transmission assembly in the Moores vehicle with the same defective parts. The Moores were forced to pay $7,619.00 out of pocket for this ostensible repair.

31.     Despite this visit, Plaintiffs' vehicle continues to exhibit the Transmission Programming Defect. To date, the Moores have not received a permanent repair to the Defect.

32.     At all times, Plaintiffs Moore, like all Class Members, has driven their vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**DEFENDANTS**

33.     Defendant American Honda Motor Co., Inc. is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. Founded in 1959, American Honda Motor Co. is a North American subsidiary of Honda Motor Company, Ltd. Discovery will show that at all relevant times herein American Honda Motor Co., Inc. was engaged in the business of marketing, distributing, servicing, and selling Honda and Acura branded automobiles and other motor vehicles and motor vehicle components in California, Florida, South Carolina, Texas, and throughout the United States of America.  American Honda Motor Co. also distributes all technical materials drafted by Honda Motor Company, Ltd. intended to be used by authorized dealerships in the service and repair of Honda and Acura branded vehicles.  AHMC also oversees certain automobile product design and market research functions into its regional operations, as of April 1, 2021.  AHMC drafts and is responsible for provided the Monroney stickers on Honda and Acura vehicles, but does so with information provided by HMC.  HMC has designated AHMC as its representative to interact with the National Highway Traffic Safety Administration and to fulfill its duties as a manufacturer under federal law.

34.     Defendant Honda Motor Company, Ltd. is a Japanese public multinational conglomerate founded in 1958 under the laws of Japan and headquartered in Tokyo, Japan. HMC

designs, manufacturers, and distributes automobiles, as well as parts for Honda and Acura branded vehicles, and is the parent company of AHMC and all other Honda-branded corporations headquartered California. Discovery will show that the design and manufacture of Class Vehicles, including their component systems and any repairs or service necessary, is the primary focus of HMC.  HMC also drafts all technical materials to be distributed by AHMC for the service and repair of Honda and Acura vehicles.  Discovery will show that the agreements which govern the relationship between HMC and AHMC give HMC substantial control over the business operations of AHMC, particularly with regards to the communications AHMC distributes on HMC's behalf.  For example, Shinji Aoyama is the chief officer of North American Regional Operations for HMC and the president and chief executive office of AHMC.

35.     At all relevant times, Defendants were and are engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or selling automobiles and motor vehicle components in California and throughout the United States.

## JURISDICTION

36.     This is a class action.

37.     Members of the proposed Class are citizens of states different from the home state of Defendants.

38.     On information and belief, aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

39.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

## VENUE

40.     AHMC and HMC, through their business of distributing, selling, and leasing the Class Vehicles, have established sufficient contacts in this district such that personal jurisdiction is appropriate.  AHMC and HMC are deemed to reside in this district pursuant to 28 U.S.C. § 1391(a).

41.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant American Honda Motor Co., Inc. is incorporated and headquartered in the state of California and HMC maintains the Honda Research& Developments Innovations in Mountain View, California.

In addition, a substantial part of the events or omissions giving rise to the claims alleged herein occurred, or a substantial part of property that is the subject of this action, is situated in California. Plaintiffs' counsel's Declaration of Venue, to the extent required under California Civil Code section 1780(d), is attached hereto as **Exhibit 1**.

**FACTUAL ALLEGATIONS**

42.     In modern vehicles, including the Class Vehicles, a Transmission Control Module controls the basic functioning of a transmission by determining from incoming sensor data when the transmission needs to shift.  Some of these inputs come from system related to the engine, including the throttle.

43.     An Engine Control Module, including the one in Class Vehicles, controls fuel injection timing, throttle position, ignition timing, and position of the camshafts, among other functions by evaluating data from various sensors to accurately judge the condition of the engine and the instructions from the driver.

44.     The Powertrain Control Module, including the one in Class Vehicles, coordinates the activities of the TCM and the ECM to monitor and improve vehicle performance, particularly in regard to power and fuel economy.  The PCM in the Class Vehicles is a single unit which contains both the ECM and the TCM.  For example, as of result of monitoring the vehicle's performance, the PCM may instruct the ECM to back off the throttle while the TCM changes the transmissions gears to make the shift smoother.  The PCM in Class Vehicles is the item marked as "1" in the diagram below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



45.     In 2014, Honda released the first Honda-made vehicle equipped with a 9-speed transmission.  "Instinctively responsive," "firmly planted," and "incredibly nimble" is how Mike Accavitti, a former vice president at Honda, characterized the ZF 9HP Transmission when it was first released in vehicles distributed, marketed, and sold by American Honda Motor Company, Inc., in 2014. As discussed above, however, the 2015 Acura TLX 3.5-liter vehicles hit the market with reviews critical of the ZF 9HP Transmission. Journalist Jason Cammisa noted that the TLX's ZF 9HP Transmission "uses an electronic shifter…[that] takes an eternity to engage drive, its shifts are clunky, and it's painfully slow to react to manual commands."[8]

46.     Having made these positive statements regarding the ZF 9HP's function, AHMC and HMC nevertheless failed to disclose their knowledge of the Transmission Programming Defect. Specifically, AHMC and HMC failed to disclose that the Class Vehicles' ZF 9HP Transmissions contained defects that caused the transmissions to exhibit rough, delayed, or sudden shifting or failure to shift; grinding or other loud noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; and sudden loss of power, due to the Transmission Programming Defect, as fully described *supra*.

---

[8] Jason Cammisa, *11 things you need to know about the 2015 Acura TLX*, Road & Track Magazine (Aug. 5, 2015), http://www.roadandtrack.com/new-cars/news/a6338/2015-acura-tlx-first-drive-review/ (last visited September 27, 2023).

47.     AHMC makes available online material information regarding the characteristics, benefits, and quality of the Class Vehicles. AHMC maintains a website regarding the Class Vehicles at https://automobiles.honda.com. AHMC also broadly disseminates information regarding the characteristics, benefits, and quality of the Class Vehicles that is closely tracked and reported by a large array of informational outlets, including automotive-focused websites such as Edmunds.com, Kelley Blue Book, Auto Trader, among many others. Honda Motor Co., Ltd. and its original overseas subsidiary, American Honda Motor Co., knew that their consumers depended in part on these sources for information about its vehicles, and had Honda Motor Co., Ltd. or American Honda Motor Co. disclosed the Defect, these sources would have likewise reported that material information.

48.     Likewise, as AHMC's authorized agents, Honda dealerships are also a primary source of information from Honda Japan and American Honda North America to consumers regarding the vehicles, and AHMC exercises great control over the information that its authorized dealerships provided to the consuming public— Plaintiffs and Class members—regarding the Class Vehicles.  In addition, AHMC communicates through its authorized dealerships to the purchasing public.

49.     Plaintiffs and Class members received information about the characteristics, benefits, and quality of the Class Vehicles from Honda dealerships. The dealerships sell the vehicles with Monroney stickers, also known as window stickers, that contain important, material information regarding the vehicles from Honda. Likewise, dealerships provide prospective buyers with brochures and other similar materials with important, material information regarding the vehicles from AHMC. Additionally, the authorized dealerships' salespeople provide prospective purchasers with important, material information from American Honda Motor Co. regarding the vehicles. Furthermore, under the terms of American Honda Motor Co.'s express warranty, Plaintiffs must bring their vehicles to Honda dealerships to perform warranty repairs, and it is through its dealership network that American Honda Motor Co. circulated its technical service bulletins regarding the Defect. In sum, American Honda Motor Co. knew that its customers depended in part on its authorized dealerships for information about its vehicles, and American

Honda Motor Co.'s authorized dealerships would have disclosed the Transmission Programming Defect had American Honda Motor Co. required it. Yet, American Honda Motor Co. omitted and failed to disclose the Transmission Programming Defect through one of the many consumer-focused informational channels, including the vehicles' window stickers, brochures, and through other materials sold at the dealerships and provided to the salespeople.

**The Agency Relationship Between American Honda Motor Company and its**

**Network of Authorized Dealerships**

50.     In order to sell vehicles to the general public, AHMC enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, AHMC-branded vehicles, the authorized dealerships are also permitted under these agreements with AHMC to service and repair these vehicles under the warranties AHMC provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, AHMC's authorized dealerships are AHMC's agents, and the consumers who purchase or lease AHMC vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their AHMC vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements that create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

51.     Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of AHMC's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by AHMC. AHMC's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of AHMC's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

52.     AHMC issued the express warranty to the Plaintiffs and the Class members.

AHMC also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. AHMC also is responsible for the content of the Monroney Stickers on AHMC-branded vehicles. Because AHMC issues the express warranty directly to the consumers, the consumers are in direct privity with AHMC with respect to the warranties.

53.     In promoting, selling, and repairing its defective vehicles, AHMC acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive AHMC representatives and agents. That the dealers act as AHMC's agents is demonstrated by the following facts:

(a)     The authorized Honda dealerships complete all service and repair according to AHMC's instructions, which AHMC issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents.

(b)     Consumers are able to receive services under AHMC's issued New Vehicle Limited Warranty only at AHMC's authorized dealerships, and they are able to receive these services because of the agreements between AHMC and the authorized dealers. These agreements provide AHMC with a significant amount of control over the actions of the authorized dealerships.

(c)     The warranties provided by AHMC for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services.

(d)     AHMC controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with AHMC's authorization.

(e)     AHMC has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises

substantial control over the operations of its dealers and the dealers' interaction with the public; and

(f)    AHMC implemented its express and implied warranties as they relate to the Transmission Programming Defect alleged herein by instructing authorized AHMC dealerships to address complaints of the Transmission Programming Defect by prescribing and implementing the relevant TSBs cited herein.

54.    Indeed, AHMC's warranty booklets make it abundantly clear that AHMC's authorized dealerships are AHMC's agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "authorized dealerships." For example, the booklets state: "Your complete satisfaction with your Honda automobile is our main goal. All personnel at authorized Honda automobile dealerships are thoroughly trained to provide the best service for your vehicle." The booklets direct Plaintiffs and Class Members, should they have a problem or concern, to first "talk over your concerns with the dealership's management, such as the service manager or general manager. In most cases, a satisfactory solution is found at this step." AHMC than directs Plaintiffs and class members that if "a customer will not be totally satisfied with a dealer's decisions or action sin Step 1" to "call or write Honda Automobile Customer Service" and notify AHMC of the year, model, VIN number, the mileage, and "the name of the dealer who sold you the vehicle" and "the name of the dealer who services your vehicle Then, "the Staff at Honda Automobile Customer Service is interested in working with you and the dealership to find a satisfactory solution.

55.    Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of AHMC. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either AHMC or its agent dealerships to establish privity of contract between AHMC, on one hand, and Plaintiffs and each of the members of the Class, on the other hand, with respect to the warranties. Thus, this establishes privity with respect to the express and implied warranty between Plaintiffs and AHMC.

**Honda Had Superior and Exclusive Knowledge of the Transmission Programming Defect**

56.     AHMC and HMC had superior and exclusive knowledge of the Transmission Programming Defect and knew that the Transmission Programming Defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

57.     As early as December 2014, through TSBs, consumer complaints, and dealership repair orders, among other internal sources, AHMC and HMC knew Transmission Programming Defect and its concomitant safety hazards. Despite this knowledge, AHMC and HMC chose to equip the Class Vehicles with the ZF 9HP Transmission, and AHMC and HMC have failed to disclose this Defect to Plaintiffs and Class Members prior to the time of purchase or lease and thereafter. As a result of this failure, Plaintiffs and Class Members have been damaged.

58.     Discovery will show that before Plaintiffs purchased their Class Vehicles, AHMC and HMC knew about the Transmission Programming Defect through sources not available to consumers, including: data from Honda's own predecessor vehicles equipped with the 9-speed transmission dating back to 2014 and other pre-release testing data, including information gained from the use of developmental "mules," or pre-production testbed vehicles equipped with the Transmission; consumer complaints about the Transmission Programming Defect to Defendants' dealers who are their agents for vehicle repairs; aggregate data from Honda's dealers; consumer complaints to and resulting notice from NHTSA; early consumer complaints on websites and internet forums; dealership repair orders; TSBs applicable to the Class Vehicles; and other internal sources of information about the problem. Publicly available facts set forth *infra* further confirm AHMC's and HMC's knowledge.

59.     HMC and AHMC are experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer and vehicle warrantor, servicer, and seller, respectively, HMC and AHMC conduct tests, including pre-sale durability testing, on incoming components, including the subject Transmissions, to verify the parts are free from defect and align with HMC's specifications. For example, HMC and AHMC placed the Transmission in developmental mules and used them at its pre-production testing facilities, one of which is in Cantril, California. HMC,

through a wholly owned subsidiary Honda Development & Manufacturing of America, LLC ("HDMA")[9], also purchased and maintains, but does not run, the Transportation Research Center ("TRC") in Marysville, Ohio, where an independent evaluation of its vehicles can occur, including those with the ZF 9HP Transmission.  The TRC is used by NHTSA and other manufacturers as well to test vehicles.  HMC also maintains multiple proving grounds, used specifically by its research and development teams for design and testing of Honda and Acura-branded vehicles, including Tochigi, Takasu, and Tsukuba proving grounds, each located in Japan, and the Prachinburi course in Thailand. Software calibration, in particular, is of critical importance at the testing stage; after all, it is at this stage that a transmission's software is initially programmed / calibrated. Anomalies with respect to the transmission's software calibration and with respect to control modules' interaction and communication with sensors are often identified and addressed at the testing stage, to the extent such anomalies and problems *can* be addressed while still meeting production, performance, and efficiency targets. Discovery will thus show that due to its testing at these facilities, HMC and its original American subsidiary, AHMC, knew of the Transmission Programming Defect and its concomitant safety risks.

60.     Additionally, discovery will show that AHMC and HMC knew of the Transmission Programming Defect from the sheer number of reports received from dealerships and from customer complaints directly to Honda. AHMC's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, warranty claims data. Discovery will show that as with other automobile manufacturers, among the field data that AHMC's customer relations department collects and analyzes is the content internet forums where Honda's customers discuss their

---

[9] In 2020, HMC announced that it had decided to wholly or partially merge eight of its American subsidiaries into a single entity, HDMA.  At the same time, HMC also assigned some functions of those subsidiaries to AHMC.  *See* "Honda Unifies Manufacturing Operations and R&D in North America; Sales Organization Streamlines Auto Sales and Parts & Service Field Operations," Nov. 6, 2020 (https://hondanews.com/en-US/honda-corporate/releases/release-bd02dee71621887f2b54acd66f0f4d22-honda-unifies-manufacturing-operations-and-rd-in-north-america-sales-organization-streamlines-auto-sales-and-parts-service-field-operations) (last visited September 28, 2023).

vehicles and problems therewith. Such internet forums, such as www.OdyClub.com, provide the automakers with important information about their customers' experiences with their vehicles, and they thus monitor and analyze the content of these forums closely for customer relations, marketing, and defect identification purposes. Thus, discovery will show that Honda was aware of the customer complaints made to these internet forums set forth *infra* at the time these customers complained.

61.     With respect to the repair requests made at dealerships discussed above, the Class Members' complaints to NHTSA demonstrate that the Class Members were experiencing the symptoms of the Transmission Programming Defect: rough, delayed, or sudden shifting or failure to shift; grinding or other loud noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; and sudden loss of power. Honda, as an experienced automotive manufacturer who, in conjunction with ZF, the transmission's third-party manufacturer, was responsible for programming / calibrating the transmission's software and ensuring it was appropriately calibrated with the vehicle's engine, thus knew of the Transmission Programming Defect based on its knowledge that Class Members were complaining of the defect's symptoms. *See, e.g.,* ¶ 76(b), *infra*, where a Class Member notified NHTSA that "The contact owns a 2018 Honda Odyssey. while driving approximately 15 mph, the vehicle jerked and the engine revved. The contact stated that the engine remained on, but the vehicle did not shift into drive or reverse. All the warning indicators illuminated on the instrument panel. prior to this, while driving different speeds, the vehicle decelerated, lost power, and shut off. the vehicle was taken to Perfection Honda (2603 American Rd SE, Rio Rancho, NM 87124, 505-221-5084) where it was determined that there was no failure. the failure recurred several times and the vehicle was taken to the same dealer who was unable to duplicate the failures. the manufacturer was made aware of the failures and stated that they would be investigated. the contact stated that nothing was done…" These complaints demonstrate that, in additional to the small fraction of Class Members who knew about NHTSA and went through the effort of submitting complaints there, many others were likewise experiencing the symptoms of the Transmission Programming Defect and bringing their vehicles to their local Honda dealerships to complain about those symptoms. Honda thus

1  knew of these dealership visits and complaints and thereby knew of the Transmission

2  Programming Defect because of them.

3          62.     AHMC's warranty department similarly analyzes and collects data submitted by

4  its dealerships in order to identify trends in its vehicles. It is AHMC's policy that when a repair

5  is made under warranty the dealership must provide AHMC with detailed documentation of the

6  problem and the fix employed to correct it in order to be reimbursed. Dealerships have an

7  incentive to provide detailed information to Honda, because they will not be reimbursed for any

8  repairs unless the justification is sufficiently detailed.

9                        **Technical Service Bulletins**

10          63.     As a result of the Transmission Programming Defect, AHMC issued a service

11  campaign and multiple Technical Service Bulletins ("TSBs") to its dealers in the United States.

12  As further discussed below and in the chart attached as **Exhibit 2**, these TSBs demonstrate that

13  Honda was aware of the Transmission Programming Defect and its symptoms, and that Honda

14  typically addressed these symptoms but attempting to "patch" the control modules' software with

15  reprogrammed updates. The fact that Honda engaged with the software to the degree that Honda

16  reprogrammed it to address the symptoms of the Defect shows that Honda was highly engaged in

17  the calibration problems between the vehicle's sensors, the TCM, and the PCM. Moreover,

18  Discovery will show that HMC was involved with the study, testing, and development of the

19  repair procedures set forth in each of these TSBs.  TSBs are issued to dealerships through

20  AHMC's proprietary software, and usually detail a symptom or problem as well instruct the

21  dealership on the steps to take to make a repair.  TSBs often do not explicitly acknowledge a

22  defect, but instead maybe only reference a symptom.  Moreover, as the issuance of a TSB does

23  not mean that the manufacturer has taken steps to ensure that the issue does not reoccur – it is

24  only a direction to mechanics to perform certain actions on vehicles which demonstrate certain

25  delineated symptoms or problems.

26          64.     The chart attached as Exhibit 2 also delineates the chronology of the TSBs and

27  the Class Vehicles. The chart and the TSB-related allegations below demonstrate that, in

28  connection with each TSB, Honda directed its dealerships to revise the programming (also

known as the "calibration") of the TCM and PCM via software updates. Discovery will show that these software updates represented Honda's attempts to correct the miscalibration of the TCM and PCM software to address the symptoms of the Transmission Programming Defect, which Honda acknowledged in those TSBs. However, Honda's software updates were insufficient to remedy the Defect.

65.     AHMC first began issuing TSBs related to the Transmission Programming Defect on or around August 21, 2015, when AHMC issued TSB 15-041 covering 2015 Acura TLX vehicles equipped with the ZF 9HP Transmission.  The TSB described circumstances where the "the transmission is stuck in 4th gear, and temporary DTC P0714 is stored (ATF Temperature Sensor (Intermittent failure))." Dealers were advised to update the TCM software in affected vehicles. In layman's terms, this TSB sets forth the fact that, by the time of this TSB's August 2015 release, Honda had discovered that the TCM was failing to order shifts when it received unexpected signals from the transmission temperature sensor. Accordingly, Honda knew that, congruent with the Transmission Programming Defect, the TCM was failing to function correctly when receiving anomalous signals from sensors, *See* ¶ 6, *supra* ("With respect to the sensor data, due to this miscalibration, the TCM and PCM become unduly sensitive to variations in signals coming from the sensors that communicate with the TCM and PCM.") Likewise, congruent with the Transmission Programming Defect, Honda knew that the symptom of this miscalibration was a "failure to shift." *Id.*

66.     Then, in or around September 2015, AHMC issued TSB 15-034, which covered 2015 Acura TLX and 2016 Acura MDX vehicles equipped with the ZF 9HP Transmission and informed dealers that that "[w]hile driving, the vehicle may shift into Neutral and the transmission indicator comes on. The driver will not be able to select any other gear until the vehicle is turned off and restarted." Dealers were again advised to update the TCM software. Discovery will show that the condition in this TSB occurred because, as with TSB 15-041 discussed supra, the TCM here was again improperly programmed to account for certain conditions; in this case, intermittent power interruption, and that as a result, the TCM would simply direct the transmission to shift into neutral, causing the vehicle to suffer a "sudden loss of power, which is one of the symptoms

of the Defect. See ¶ 6.

67.     On or around November 15, 2015, AHMC issued service bulletin A15110F regarding 2016 Pilot vehicles equipped with the ZF 9HP Transmission. In the service bulletin, Honda acknowledged that its dealerships were seeing "fairly low mileage vehicle(s) with the MIL [malfunction indicator lamp] on, the Gear Position indicator blinking, and A/T DTC [automatic transmission diagnostic trouble code P2638 (torque feedback signal A range/performance). In response, AHMC directed its dealerships to reset the Powertrain Control Module with the Honda Diagnostic System and to perform an "idle learn procedure." *See* ¶ 6 ("illumination of the Malfunction Indicator Lamp (MIL).")

68.     Likewise, AHMC's November 2015 service bulletin A15110H for the 2016 Pilot equipped with the ZF 9HP Transmission noted that "multiple loss-of-communication" diagnostic trouble codes were occurring in the Transmission Control Module, which required a software update. This TSB demonstrates Honda's knowledge of the Transmission Programming Defect, because the TSB establishes that by November 2015, Honda knew that the TCM was exhibiting multiple losses of communication. *Compare to* ¶ 6 (discussing Honda's responsibility to ensure the TCM is calibrated for proper communication with other modules, such as the PCM, and that due to the Defect, losses of communication were occurring). The fact that Honda's remedy for these losses of communication was to revise the TCM's programming via a software update further shows' Honda's knowledge by November 2015 that the TCM's programming (also known as calibration) was defective in this manner.

69.     On or around January 28, 2016, AHMC issued service bulletin 16-008, "Transmission Function Improvements: Sensation of Surge While Braking, Slow Downshift Response at Low Engine Speeds, and Other Listed Symptoms." The service bulletin applied to the 2016 Honda Pilot equipped with the ZF 9HP Transmission. In the service bulletin, as shown in the image below taken directly from the bulletin (from the April 21, 2016, update which added the highlighted symptom), AHMC admitted that the vehicles were surging while braking, staying in gear too long, surging out of a stop, hesitating out of a stop, exhibiting poor acceleration or bogging noise, and that the transmission "feels rough at low speeds." In response, AHMC directed

its dealerships to update both the Powertrain Control Module and the Transmission Control Module software, and then perform the idle relearn procedure. Honda also admitted that "Failure to update both the PCM and the TCM software at the same time will result in poor shift quality and a comeback." This TSB demonstrates Honda's knowledge of the Defect. As discussed *supra* in ¶ 6, the Transmission Programming Defect resulted in "incorrect torque calculation" and "delayed shifting," both of which occurred in this TSB as a result of miscommunication between the PCM and TCM. For example, in this TSB, Honda indicated that the vehicles were exhibiting the following symptoms:

| SYMPTOM | UPDATE |
|---|---|
| There is a sensation of acceleration while coasting down a hill. | Engine mapping has been changed to better manage 8-7 and 5-4 downshifts with the throttle closed. |
| There is a sensation of a surge while braking. | |
| The transmission feels like it stays in the gear too long. | Transmission mapping on the 5-4-3 downshift when accelerating at low engine speeds was changed to a 5-3 downshift to provide a quicker acceleration response. |
| During slight acceleration, there is a surge or hesitation from a stop. | Low-speed acceleration feel in 1-3 gears has been improved. |
| The transmission feels rough at low speeds. | |
| There is a hesitation from a stop (with idle stop canceled). | |
| There is poor acceleration or bogging noise at slow engine speeds. | Torque converter lock up strategy has been improved for low-speed drivability (parking lot speeds). |
| P2638 (Does not turn on the MIL) | Improved torque accuracy monitoring. |

"Acceleration while coasting," "surge while braking," and "surge or hesitation from a stop" all constitute inaccurate torque calculation, a condition of the Defect described *supra*, and sudden or harsh accelerations, which are symptoms of the defect. Similarly, "Poor acceleration or bogging noise at slow engine speeds" constitutes delayed shifting, another symptom of the defect. The fact that Honda's remedy for these symptoms was to revise the TCM and PCM's programming via a software update further shows' Honda's knowledge by January 2016 that the TCM and PCM's programming (also known as calibration) was defective in this manner. So too does Honda's admission in the TSB that "failure to update both the PCM and the TCM software at the same time will result in poor shift quality and a comeback," an admission which discovery will show Honda included due to its experience with miscalibration between the PCM and TCM occurring

1     in connection with these software updates.

2         70.    On or around February 17, 2016, AHMC issued service bulletin No. 16-012

3 covering 2015-2016 Acura TLX vehicles equipped with the ZF 9HP Transmission and informing

4 dealers that "[t]he transmission feels like it stays in gear too long." Dealers were again advised to

5 update the TCM software. The TSB also cautioned that the software update "will change the way

6 the transmission shifts." This TSB support's Honda's knowledge of the Transmission

7 Programming Defect, as it shows that Honda knew, by this TSB's February 2016 release, that the

8 TCM's software was causing the transmission to exhibit delayed shifting, a symptom of the

9 defect, and that the remedy for that symptom was to correct the TCM's programming (also

10 referred to as "calibration") through a software update.

11         71.    On or around February 18, 2017, AHMC issued service bulletin no. 17-014,

12 applicable to the 2016 and 2017 Honda Pilot. In the bulletin, which was a follow up to the earlier

13 service bulletin 16-091, Honda again admitted that the vehicles were juddering at speeds between

14 20 and 60mph due to "deteriorated transmission fluid" which was "deteriorate[ing] quicker than

15 expected when it is exposed to intermittent high heat loads under specific driving conditions."

16 However, rather than simply replace the transmission fluid, AHMC issued a direction to update

17 the software of the TCM. This TSB demonstrates Honda's awareness, as of February 18, 2017,

18 that the TCM was incorrectly programmed such that it was mistiming the application of clutches

19 and thus allowing excessive clutch slippage, leading to excessive heat. Moreover, Honda

20 addressed this condition by reprogramming the TCM via a software update.

21         72.    On or around June 12, 2019, AHMC issued service bulletin 19-004. In the bulletin,

22 which applied to the 2016-2017 Honda Pilot vehicles equipped with the ZF 9HP Transmission,

23 AHMC admitted that during downshifts from the 9th or 8th gear to the 7th gear or lower, a

24 miscalculation in the 9-speed transmission's Transmission Control Module software causes the

25 Malfunction Indicator Lamp to illuminate. In response, AHMC directed its dealerships to update

26 the Transmission Control Module software. This TSB demonstrates Honda's knowledge that the

27 Transmission Programming Defect was causing the MIL to illuminate, and Honda's efforts to

28 correct that condition through correcting the TCM's programming via a software update.

73.     On or around December 23, 2019, AHMC issued service bulletin no. 19-124, entitled "9-Speed A/T Hard Upshift with Steady Acceleration or MIL On with DTC P0716." In the bulletin, which applied to the 2018-2019 Honda Odyssey vehicles equipped with the ZF 9HP Transmission, AHMC admitted that "the transmission has intermittent harsh or jerky upshifts with steady acceleration, or the MIL comes on with DTC P0716." AHMC attributed this problem to abnormal Transmission Control Module adaptation values or a miscalculation in the Transmission Control Module software. In response, AHMC directed its dealerships to update the Transmission Control Module.  This TSB was re-issued several times, adding additional affected vehicles, before being revised on or around April 1, 2020, to state that only 2018-2019 Odysseys with the "9-speed A/T" were affected. This TSB demonstrates Honda's continuing knowledge of the Transmission Programming Defect. Under this condition, the TCM was causing rough shifts—a symptom of the Defect—because the TCM was miscalculating input and output ratios (which is what the TSC's DTC P0716 refers to). Accordingly, the TCM was either engaging gears too quickly, thus causing a hard/harsh shift, or engaging the gears too slowly, causing the MIL indicator to illuminate and store the trouble code DTC P0716. Moreover, Honda's remedy for this condition was to correct the TCM's programming through a software update. This TSB thus further demonstrates Honda's longstanding knowledge of the Transmission Programming Defect and its symptoms.

74.     For the 2020 model year Honda Odyssey, AHMC did not use the ZF 9HP Transmission.  As of the date of this Complaint, no TSBs have been issued for software updates in the 2020 Honda Odyssey.

**Class Members' Complaints to the National Highway Traffic Safety Administration and Elsewhere**

75.     Automakers like HMC and AHMC monitor customers' complaints made to the National Highway Traffic Safety Administration ("NHTSA.") Federal law requires automakers like Honda to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer

complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

76. Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, discovery will show that Honda knew of the many complaints about the Transmission Programming Defect logged by NHTSA Office of Defect Investigation (ODI), and the content, consistency, and large number of those complaints alerted Honda to the Transmission Programming Defect.

77. The following are examples of complaints from owners and lessees of the Class Vehicles concerning the Transmission Programming Defect available through NHTSA's website, www.safercar.gov. Unless otherwise specified, spelling and grammar mistakes appear as in original.

    a. **DATE OF INCIDENT:** March 3, 2018
       **DATE COMPLAINT FILED:** July 29, 2018
       **NHTSA/ODI ID:** 11114414
       **SUMMARY:** IF I BUY A NEW 2018 HONDA ODYSSEY AT AROUND 4000 MILES START HAVING TRANSMISSION PROBLEMS AT AROUND FIVE TO SIX THOUSAND MILES I START GETTING A HORRIBLE TOXIC BURNING CHEMICAL SMELL COMING FROM INSIDE THE CAR SOMEWHERE DO YOU TAKE IT TO THE DEALERSHIP THEY SAY NOTHING'S WRONG OBVIOUSLY THERE IS SOMETHING WRONG WITH HIS DOING WHAT IT'S DOING.

    b. **DATE OF INCIDENT:** June 15, 2018
       **DATE COMPLAINT FILED:** August 27, 2018
       **NHTSA/ODI ID:** 11122827
       **SUMMARY:** TL* THE CONTACT OWNS A 2018 HONDA ODYSSEY. WHILE DRIVING APPROXIMATELY 15 MPH, THE VEHICLE JERKED AND THE ENGINE REVVED. THE CONTACT STATED THAT THE ENGINE REMAINED ON, BUT THE VEHICLE DID NOT SHIFT INTO DRIVE OR REVERSE. ALL THE WARNING INDICATORS ILLUMINATED ON THE INSTRUMENT PANEL. PRIOR TO THIS, WHILE DRIVING DIFFERENT SPEEDS, THE VEHICLE DECELERATED, LOST POWER, AND SHUT OFF. THE VEHICLE WAS TAKEN TO PERFECTION HONDA (2603 AMERICAN RD SE, RIO RANCHO, NM 87124, 505-221-5084) WHERE IT WAS DETERMINED THAT THERE WAS NO FAILURE. THE FAILURE RECURRED SEVERAL TIMES AND THE VEHICLE WAS TAKEN TO THE SAME DEALER WHO WAS UNABLE TO DUPLICATE THE FAILURES. THE MANUFACTURER WAS MADE AWARE OF THE FAILURES AND STATED THAT THEY WOULD BE INVESTIGATED. THE CONTACT STATED THAT

NOTHING WAS DONE…

c.   **DATE OF INCIDENT:** July 22, 2018
**DATE COMPLAINT FILED:** July 24, 2018
**NHTSA/ODI ID:** 11113272
**SUMMARY:** HAVING ISSUE OF ACCELERATION AT ROAD SPEED.
WHEN DOING ROAD SPEED I HAVE HAD FLAT ACCELERATION WHEN
PRESSING GAS PEDAL.
ALMOST FEELS AS IF VEHICLE IS ABOUT TO STALL OR DECELERATE.
DEALER WITH VEHICLE AND THEY CAN'T FIND ISSUE. DEALER
CLAIMS THEY HAVE NOT HAD ANY
HONDA COMPANY REPORTS ABOUT THIS.
THIS EVENT HAS HAPPENED SEVERAL TIMES.
LAST EVENT INTERESTING IS THAT THIS HAS HAPPENED WHEN
DECELERATING TO ENTER EZPASS EXPRESS TOLL AT AT 50MPH AND
THEN TRYING TO ACCELERATE TO FLOW OF TRAFFIC.

d.   **DATE OF INCIDENT:** August 26, 2018
**DATE COMPLAINT FILED:** November 28, 2018
**NHTSA/ODI ID:** 11154477
**SUMMARY:** TWICE IN THE FIRST YEAR OF OWNERSHIP, THE CAR WAS
PARALLEL PARKED AND I PUT THE VEHICLE IN DRIVE (PUSH BUTTON
SIFTER). UPON THE VEHICLE BEGINNING TO MOVE IN FORWARD
MOTION IT WOULD IMMEDIATELY SHIFT BACK INTO PARK. I
REPEATED AN IT DID THE SAME OVER AND OVER AGAIN. EVEN AFTER
SHUTTING DOWN THE ENGINE AND RESTARTING; I HAD THE SAME
ISSUE. BOTH TIMES THIS OCCURRED, HAD TO GO IN REVERSE FOR A
SHORT DISTANCE IN ORDER TO GET THE VAN TO THEN MOVE
FORWARD WITHOUT ALMOST INSTANTLY SHIFTING BACK INTO
PARK. IN THE SECOND CASE THERE WAS NO VEHICLE PARKED IN
FRONT OR BEHIND ME AND I STILL HAD THE SAME ISSUE. I DID
RECORD A VIDEO OF THE ERRATIC BEHAVIOR ON 8/26/2018 (SECOND
TIME) .

e.   **DATE OF INCIDENT:** September 10, 2018
**DATE COMPLAINT FILED:** December 11, 2018
**NHTSA/ODI ID:** 11160764
**SUMMARY:** USUALLY AT LOWER SPEED(15~30MPH),

TRANSMISSION STRUGGLES TO SHIFTING GEAR. AND HESITATES TO
SHIFT.

ALSO, THERE IS SHIFT SHOCK AT LOW SPEED.

IT IS WORST IN THE MORNING.

I WENT TO DEALER TO CHECK THAT CONDITION AND TECHNICIAN
SAID

THAT IS NORMAL.

f.   **DATE OF INCIDENT:** November 1, 2018
**DATE COMPLAINT FILED:** November 19, 2018
**NHTSA/ODI ID:** 11152405
**SUMMARY:** WITH APPROXIMATELY 10,000 MILES ON THE VEHICLE,
THE TRANSMISSION UNDER PERFORMS. WHILE DRIVING, USUALLY

AT SPEEDS UNDER 30MPH, THE TRANSMISSION STRUGGLES TO SHIFT SMOOTHLY. IT ALSO MAKES A LOUD JERKING SOUND AND MOTION WHEN SHIFTING GEARS. THE TRANSMISSION ALSO SOMETIMES HESITATES TO SHIFT, ALLOWING YOU TO BE ABLE TO FEEL THE VAN SLOW DOWN WHILE IN PROCESS OF SHIFTING, APPROXIMATELY 2 SECONDS LATER YOU CAN HEAR AND FEEL IT GO INTO GEAR. LASTLY, THE PICK UP ON THE VAN IS SLOWER THAN MOST CARS I HAVE DRIVEN.

g. **DATE OF INCIDENT:**  January 20, 2019
**DATE COMPLAINT FILED:**  May 14, 2019
**NHTSA/ODI ID:** 11207593
**SUMMARY:** AUTO SHIFTING ANYWHERE FROM 20-30MPH RESULTS IN HARD SHIFT OR KNOCK. WHEN VAN IS DOWNSHIFTING THERE IS AN ACCELERATION OR KNOCK. TRANSMISSION WAS REPLACED AT 22,000 MILES. NO EXPLANATION FOR THE CAUSE. THIS WAS NOTICED ABOUT 3 MONTHS INTO OWNING THE VEHICLE BRAND NEW AT 8 MILES FROM A HONDA DEALERSHIP. IT TOOK THEM 13 MONTHS OF A CONTINUOUS CYCLE OF GOING INTO THE HONDA CERTIFIED SHOP FOR THEM TO BELIEVE US. NOW OUR VEHICLE AT 25,000 MILES CONTINUES TO REPRODUCE THE SAME PROBLEM.

h. **DATE OF INCIDENT:**  February 4, 2019
**DATE COMPLAINT FILED:**  February 8, 2019
**NHTSA/ODI ID:** 11175742
**SUMMARY:** I'VE HAD MY 2018 HONDA ODYSSEY TOURING FOR 2 MONTHS; IT HAS 2600 MILES.

MY VEHICLE SHIFTED INTO PARK WHILE DRIVING 70MPH ON THE INTERSTATE! THE CAR MADE A POPCORN/GRAVEL SLAMMING AGAINST THE CAR SOUND WHILE FELT AS THOUGH THE BOTTOM HALF OF THE VAN WAS TRYING TO SEPARATE FROM THE TOP!! TALK ABOUT FRIGHTENING! IT BRIEFLY FLASHED ""COLLISION MITIGATION"-SOMETHING,, BUT IT WAS JUST ON THE SCREEN FOR A HALF-SECOND. I PULIED OVER TO THE SIDE OF THE HIGHWAY, PUT MY FOOT ON THE BRAKE AND PRESSED THE DRIVE BUTTON. IT HAPPENED AGAIN MAYBE 10 MINUTES LATER ON A BUSY ROAD TRAVELING AT 45MPH.

I ARRIVED AT MY FIRST DESTINATION, RESEARCHED HOW TO TURN OFF THE COLLISION MITIGATION SYSTEM, AND CONTINUED TO MY SECOND DESTINATION. IT HAPPENED TWICE ON THE HIGHWAY ON THE WAY TO THAT DESTINATION, FLASHING THE SAME WARNING SO QUICKLY THAT I COULDN'T READ IT, SAME NOISE, VIBRATION.

I CALLED THE DEALERSHIP FROM WHICH I BOUGHT IT. THEY TOWED THE VEHICLE TO THE DEALERSHIP. THEY COULD NOT REPRODUCE THE PROBLEM. "BEST EDUCATED GUESSED" THAT THE BATTERY WAS THE PROBLEM, THOUGH I NEVER RECEIVED A LOW BATTERY WARNING FROM MY VEHICLE, AND THEY PERFORMED A BATTERY RESET PROCEDURE.

THE DEALERSHIP EXPECTS ME TO DRIVE MY FAMILY HOME IN THIS VEHICLE WITHOUT CHANGING OR EVEN INSPECTING THE TRANSMISSION OR PARKING PAWL, WHICH WAS THE CAUSE OF THE LOAD POPCORN/GRAVEL NOISE.

I HAVE CONTACTED HONDA AND A CASE HAS BEEN OPENED.

i.  **DATE OF INCIDENT:**  March 29, 2019
    **DATE COMPLAINT FILED:**  May 29, 2019
    **NHTSA/ODI ID:** 11210574
    **SUMMARY:** THE VEHICLE IS HAVING INTERMITTENT ISSUES WITH THE TRANSMISSION SHIFTING.  THE SPEED SEEMS TO VARY, THE RANGE IS BETWEEN 24 AND 33 MPH.  IT SEEM TO BE MOST PREVALENT AFTER BEING ON THE HIGHWAY FOR A LONGER PERIOD OF TIME, 45 MINUTES AND LONGER.  THEN WHEN AACCELERATING GENTLY FROM A STOP IT CAN LURCH WHEN SHIFTING, OR SHIFT HARD AND MAKE AN AUDIBLE CLUNK.

    OTHER TIMES, NOT HAVING BEEN DRIVEN FOR ANY LENGTH OF TIME, IN THE SAME SPEED RANGE, 24 TO 33 MPH, DURING GENTLE ACCELERATION IT DOES NOT SHIFT EASILY OR SMOOTHLY. THERE IS NOT NECESSARILY A CLUNK (THERE CAN BE), BUT IT DOES NOT SHIFT NORMALLY OR SMOOTHLY, I WOULD DESCRIBE IT A MISS OR LURCH.

    IN BOTH CASES IT WILL SHIFT, BUT NOT AS IT SHOULD. THIS BEGAN AROUND 17,000 MILES.

    I AM NOTICING VERY FINE VIBRATIONS IN THE STEERING WHEEL AND THROUGHOUT THE FRONT END, ITS NOT ALL THE TIME, BUT IT DOES NOT SEEM RIGHT. I AM UNABLE TO ASSOCIATE IT WITH ANY PARTICULAR SPEED OR STRETCH OF ROAD, BUT IT DID NOT DO THIS WHEN THE VEHICLE WAS NEW.

j.  **DATE OF INCIDENT:**  April 1, 2019
    **DATE COMPLAINT FILED:**  May 11, 2019
    **NHTSA/ODI ID:** 11207033
    **SUMMARY:** AUTO SHIFTING ANYWHERE FROM 20-30 MPH RESULTS IN HARD SHIFT AND KNOCK. WHEN VAN DOWNSHIFTS AROUND 20-30 MPH THERE IS A JUMP OF ACCELERATION AND KNOCK. SOMETIMES WHEN ACCELERATING AND GEARS SHIFT THERE IS UN EXPECTED JUMP IN ACCELERATION

k.  **DATE OF INCIDENT:**  April 13, 2019
    **DATE COMPLAINT FILED:**  April 15, 2019
    **NHTSA/ODI ID:** 11196583
    **SUMMARY:** WHILE DRIVING ON A 50 MPH, TWO LANE ROAD, THE VEHICLE ABRUPTLY SHIFTED INTO NEUTRAL AUTONOMOUSLY AFTER EXPERIENCING A TRANSMISSION FAILURE AND PROHIBITED THE DRIVER FROM RETAKING CONTROL OF THE VEHICLE. WITH NO POWER AVAILABLE, THE DRIVER WAS ULTIMATELY FORCED TO COAST TO A STOP ON THE SHOULDER OF THE ROAD. WARNING MESSAGES INDICATED A TRANSMISSION FAILURE, EMISSION CONTROL FAILURE, AND BLIND SPOT MONITORING FAILURE. THE CAR WAS TOWED TO THE NEAREST HONDA DEALER.

l.  **DATE OF INCIDENT:**  May 1, 2019
    **DATE COMPLAINT FILED:**  May 22, 2019
    **NHTSA/ODI ID:** 11209239
    **SUMMARY:** TL* THE CONTACT OWNS A 2018 HONDA ODYSSEY. WHILE DRIVING VARIOUS SPEEDS, THE VEHICLE SHIFTED INTO

NEUTRAL GEAR WITHOUT WARNING. THE FAILURE OCCURRED INTERMITTENTLY. THE CHECK ENGINE AND COLLISION WARNING INDICATORS ILLUMINATED. HONDA OF OLATHE (1000 N ROGERS RD, OLATHE, KS 66062, (913) 782-3636) DIAGNOSED THAT THE FUSE AND THE BATTERY NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 24,000. THE VIN WAS UNAVAILABLE.

m. **DATE OF INCIDENT:** May 21, 2019
**DATE COMPLAINT FILED:** July 3, 2019
**NHTSA/ODI ID:** 11229195
**SUMMARY:** TRANSMISSION SLIPPING WHEN ACCELERATING FROM STATIONARY POSITION OR WHENEVER MORE SPEED IS NEEDED. HAPPENS WHEN GOING UPHILL OR LANE CHANGING WHEN MORE SPEED IS NEEDED.

n. **DATE OF INCIDENT:** July 3, 2019
**DATE COMPLAINT FILED:** October 8, 2019
**NHTSA/ODI ID:** 11266984
**SUMMARY:** VEHICLE EXPERIENCES ROUGH SHIFTING WHEN SLOWING DOWN AND SPEEDING UP IN STOP IN GO TRAFFIC. IT IS LIKE IT FALLS INTO GEAR, AND NOT A SMOOTH SHIFT. VERY DISAPPOINTED FOR A $33,000 PURCHASE. THIS HAPPENS ON THE HIGHWAY, OR ON RESIDENTIAL ROADS.

o. **DATE OF INCIDENT:** August 30, 2019
**DATE COMPLAINT FILED:** August 30, 2019
**NHTSA/ODI ID:** 11252464
**SUMMARY:** WHEN DECELERATING AT THE SPEED AROUND OF 25 MAKES A LOUD KNOCKING SOUND AND SHIFTS ERATTICALLY [spelling corrected].

p. **DATE OF INCIDENT:** November 26, 2019
**DATE COMPLAINT FILED:** December 1, 2019
**NHTSA/ODI ID:** 11283068
**SUMMARY:** OWNER OF 2018 ODYSSEY EXL RESNAV W/ 9SPEED AT

WIFE IS PRIMARY DRIVER AND WE RECENTLY RETURNED FROM A ROAD TRIP. VEHICLE PERFORMS VERY SMOOTHLY 95% OF THE TIME. THE OTHER 5% YOU CAN EXPECT ABRUPT AND VIOLENT UP AND DOWN SHIFTS. FURTHER, THIS IS THE SAFETY VS ANNOYANCE ISSUE, THE VEHICLE WILL HESITATE WHEN ACCELERATING FROM A STOP. THIS IS A FACTOR THREAT WHEN PULLING INTO TRAFFIC. HESITATION CAN AND WILL CAUSE AN ACCIDENT. HONDA OF NA NEEDS TO GET TO WORK AND TAKE RESPONSIBILITY FOR THIS UNACCEPTABLE SAFETY ISSUE. SOMEONE IS GOING TO BE HURT.

q. **DATE OF INCIDENT:** December 30, 2019
**DATE COMPLAINT FILED:** January 21, 2020
**NHTSA/ODI ID:** 11300974
**SUMMARY:** I HAVE HAD THIS VERY PROBLEM IN MY 2018 EX WITH NAV RES. I'LL BE ON THE HIGHWAY, GOING 65MPH+, AND I WILL ACCELERATE TO CHANGE LANES OR PASS AND THE ENGINE WILL SEEMINGLY STALL FOR SEVERAL SECONDS. AS I PRESS THE GAS, THE CAR ACTUALLY DECELERATES AS IF IT'S COASTING IN NEUTRAL.

AFTER A FEW SECONDS, IT REENGAGES, THE ENGINE REVS A LITTLE, AND THE CAR BEGINS ACCELERATION. I ALSO OFTEN NOTICE THAT THE VAN DOES A SIMILAR THING WHEN I'M ACCELERATING FROM A STOP TO ENTER TRAFFIC OR MAKE A TURN. WHEN I HIT THE GAS, THE CAR COASTS FORWARD FOR A SECOND BEFORE ACTUALLY ACCELERATING. IT IS ACTUALLY DANGEROUS, ESPECIALLY SINCE IT HAS HAPPENED WHEN THERE HAS BEEN ONCOMING TRAFFIC. I HAVE HAD IT INTO THE DEALERSHIP MULTIPLE TIMES AND THEY "CAN'T REPLICATE THE PROBLEM." TODAY MY DEALERSHIP TOLD ME THAT I SHOULD OPEN A CASE WITH HONDA, WHICH I DID. I WAS TOLD THAT THE 9-SPEED TRANSMISSION WAS DISCONTINUED BECAUSE CONSUMERS "COMPLAINED" AND "DIDN'T LIKE IT." THEY FURTHER SAID THAT THEY COULD NOT REPLICATE THE PROBLEM AND THEREFORE COULD NOT FIX IT. IN THE CASE OF MY VAN, IT IS DEFECTIVE AND DANGEROUS. MY SON IS LEARNING TO DRIVE AND I AM FEARFUL FOR HIS SAFETY. I HAVE FELT IN DANGER IN THIS CAR MYSELF. WHEN I ASKED ABOUT TO WHOM I COULD SPEAK TO ADDRESS MY CONCERNS, I WAS DIRECTED TO "PAGE 2 OF THE ONLINE OWNER'S MANUAL." THIS HAS HAPPENED ON NUMEROUS OCCASIONS AND HAS BEEN INTO THE DEALERSHIP FREQUENTLY WITHOUT RESOLUTION.

r.   **DATE OF INCIDENT:**  February 27, 2020
**DATE COMPLAINT FILED:**  March 6, 2020
**NHTSA/ODI ID:** 11316579
**SUMMARY:** TL- THE CONTACT OWNS A 2018 HONDA ODYSSEY. THE VIN WAS NOT PROVIDED. THE CONTACT STATED THAT WHILE BACKING UP AT ABOUT 2 MPH, THE TRANSMISSION WENT FROM DRIVE TO PARK WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE GENTHE HONDA DEALER, LOCATED AT 15100 EUREKA RD, SOUTHGATE, MI 48195, WHERE THE TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE. THE FAILURE RECURRED ON THE SAME DAY AND DID NOT RECUR IN THE FOLLOWING DAYS. . THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 33,000. FE

s.   **DATE OF INCIDENT:**  March 2, 2020
**DATE COMPLAINT FILED:**  March 6, 2020
**NHTSA/ODI ID:** 11316560
**SUMMARY:** THE TRANSMISSION IN THIS VEHICLE LAGS AND SLIPS REGULARLY WHEN SHIFTING FROM 2ND TO 3RD GEAR. IT IS A MAJOR SAFETY ISSUE. WE TOOK THE VEHICLE IN TO A HONDA DEALER TO SERVICE THIS PROBLEM UNDER WARRANTY AND WERE TOLD THAT THE PERFORMANCE WE ARE EXPERIENCING IS NORMAL FOR THIS SPECIFIC TRANSMISSION. IT US UNACCEPTABLE THAT HONDA WOULD ALLOW THIS TRANSMISSION TO BE USED BY SO MANY IN SUCH AN UNSAFE WAY.

78.    Class Members also reported the Transmission Programming Defect on online forums:

**www.OdyClub.com[10] – What's the Verdict on the 9-Speed Transmission?**

a. **March 9, 2018** (posted by salsolomon): Based on reading these comments on the transmission issues with the 2018 Odyssey, I have now almost decided that I will go with the 2019 Subaru Ascent instead of the 5'th generation Odyssey. Honda has given me enough sleepless nights worrying about the transmission on my 2004 Odyssey. The 2004 Odyssey is a great vehicle, but I could have done without the heartburn that the worries about its transmission caused me. And, Honda really needs to learn a lesson on the Transmission front. Honda has a great 10-speed transmission now. And, yet it is shoving down that problematic ZF transmission down our throats. I used to be a great Honda fan. I am not sure anymore. So sad.

b. **March 12, 2018** (posted by jrc87): The 9speed is not refined at all, I would consider it garbage (I bought an EX-L with one so, yes, I can say that). It's depressing to drive a brand new car with a transmission that feels worse than your average 10-year old dump.

Unfortunately, when test driving the vehicle you're driving around with a sales guy in the back seat talking about features. You're stunned with all the technology and your brain is more focused on testing what this or that shiny button does instead of paying attention to so many other factors.

After buying the car and letting all things set in, you start noticing that the transmission jerks when shifting gears up or down. It gets confused many times so it has to change gears again which causes the car to jerk yet again. You then start reading that it has presented so many problems in the past and doubt start setting in.... Your 4, 5, 6, 7 hundred dollar car payment starts to hurt a little more when you realize you just got a piece of junk.
My previous vehicle was a Honda Sorrento SXL (which was flawless by the way, drove like a 70k SUV). The dealer had this "24hr test drive" where they gave me a sorrento to try for a whole day/night. I wish more dealers did this. I would have probably detected the garbage the 9-speed is before committing to it.
So, if you're reading this and you already bought it: sorry, we're all on the same boat now.
if you're reading this and you haven't bought it: Skip it. Seriously, save more money to get the 10-speed or go elsewhere (Honda/Toyota). That is my humble opinion.
(Note: the Chrysler pacifica uses the SAME transmission built by the SAME manufacturer, so you're not safe there either)
Good luck everyone!

c. **March 21, 2019** (posted by HondaBox): +10000000 As an ex 2016 Acura MDX owner the ZF 9spd was total garbage. It made me almost walk away from Honda/Acura completely. I've been warning people over and over when I can on this forum to stay away from the 9 spd ZF…

d. **July 12, 2018** (posted by FreeRadical): In my opinion, the transmission is a monster. It fights me at every turn.
Most of the time on launch, it wants to immediately upshift (since we all have to worship at the altar of fuel efficiency), and I have to work it to get the acceleration I want. Sometimes, it just acts bizarrely. If I put my foot into it, it seems to go through a bunch of decision-making: it goes to higher RPMs, then briefly upshifts, then downshifts and makes a racket, all the while with not much happening at the tires. It will finally realize that I want to go briskly and will let the excellent engine

---

[10]Thread available at https://www.odyclub.com/threads/whats-the-verdict-on-the-9-speed-transmission.323474/page-2, (*last accessed* September 28, 2023).

do its thing.

It mightily resists downshifting if I want to squeeze on the power at mid to high speeds. I have to get into it more than I would like and then it downshifts and makes a racket and lunges ahead. Sometimes it makes a racket and I feel nothing at the tires for quite a while.

When coasting at low speeds, it seems to be in too low a gear and that causes lashing on small throttle changes. And even though it seems like it's in a low gear, it still takes forever to do anything if I want to increase my speed.

The silly "sport" mode makes it drive like a tractor with even more lash than in normal mode. It seems like a CVT, but is supposed to be a 9 speed.

It makes me pine for my beloved 2006 Odyssey that I traded in. That was probably the best auto transmission I have ever driven. It seemed to always be in the right gear, like when I was in a slowing coast and wanted to go faster, or in exiting a turn. It was ready and able to downshift with a bit of added throttle.

Oh, what happened? When did Honda start making Toyotas?

79.     Likewise, owners of predecessor Honda-made vehicles equipped with the ZF 9HP Transmission had been reporting the transmission's problems to NHTSA for years before the Class Vehicles were released. Despite these reports, in addition to its own internal information about the functionality of this transmission in the Class Vehicles, Honda chose to equip the Class Vehicles with the defective ZF 9HP Transmission. Below is but a small sample of the scores of similar complaints about other vehicles with the ZF 9HP Transmission, and attached as **Exhibit 3** is a more fulsome list of these complaints to NHTSA.

**2015 Acura TLX**

(a)     11/10/14 ABNORMAL SHIFTS LOW SPEED

(b)     1/16/15 TRANSMISSION IS JERKY. DOES NOT SHIFT SMOOTHLY IN 2 AND 3 GEARS. SOMETIMES ACCELERATES BEFORE DOWNSHIFTING TRANSMISSION SEEMS OK IN HIGHER GEARS. CAR DOES NOT ACCELERATE PROPERLY IN LOW GEARS. MAKES DRIVING RISKY AND DIFFICULT UNTIL CAR IS IN HIGHER GEARS. *TR

(c)     2/5/15 TRANSMISSION HAS EXTREMELY BAD JERK FROM 2ND TO 3RD GEAR. ALSO, TRANSMISSION TENDS TO MAKE CAR ACCELERATE ON ITS OWN SOMETIMES. ALSO, DOWNSHIFTING IS TOO SLOW TO MAKE AN EFFECTIVE PASS ON A HIGHWAY. HORRIBLE, UNSAFE FEELING TRANSMISSION. *TR

(d)     2/10/15 ISSUES WITH TRANSMISSION SHIFTING. 1. DELAY OF ACCELERATION AT LOW SPEED SUCH AS AT AN INTERSECTION (4 OCCURRENCES) WHERE MAKING A TURN CAR DOES NOT READILY ACCELERATE DUE TO BEING IN TOO HIGH OF A GEAR WHILE IN AUTOMATIC MODE. AFTER ABOUT 2 SECONDS, CAR DOWNSHIFTS AND RESUMES NORMAL ACCELERATION. HAS NOT RECURRED IN AT LEAST A MONTH. 2. ROUGH SHIFT (LAG) WHEN CAR UPSHIFTS FROM 2ND TO 3RD. THIS HAS BEEN PRESENT SINCE PURCHASE AND OCCURS REGARDLESS OF WHAT MODE (AUTO/MANUAL) IS SELECTED. HAS NOT IMPROVED. 3.WITHIN LAST 30 DAYS, VEHICLE IS NOT DOWNSHIFTING CORRECTLY WHEN COMING TO A STOP. CAR DOES NOT ACTUALLY DOWNSHIFT INTO 1ST UNTIL AFTER IT IS AT A COMPLETE STOP RESULTING IN A LURCH. NO MATTER HOW SMOOTHLY THE CAR IS BROUGHT TO A STOP, THE FINAL DOWNSHIFT IN AUTO MODE DOESN'T OCCUR UNTIL AFTER REACHING A STOP. THE PROBLEM DOES NOT START TO HAPPEN UNTIL ENGINE/CAR IS WARM AS THE FIRST FEW COMPLETE STOPS WHEN COLD ARE 100% OK, THEN AFTER WARMED UP IT WILL OCCUR EVERY TIME THEREAFTER. 4. WHEN ENGAGING DRIVE OR REVERSE, THE VEHICLE WILL BEGIN TO ACCELERATE SLIGHTLY WITHOUT PEDAL INPUT SUCH AS WHEN BACKING OUT OF A PARKING SPACE. CONTACTED DEALER AND DEALER SAID NO INSTRUCTIONS FROM MAKER OR TSB'S YET AND THAT TRANSMISSION WAS NEW MODEL AND MAKER NOT SURE WHAT TO EXPECT. TOLD DEALER I WOULD DRIVE THE CAR FOR A FEW MORE WEEKS TO SEE IF SITUATION IMPROVES. DID NOT TAKE CAR IN FOR CHECK BASED ON DEALER COMMENT THAT THERE WAS NO INSTRUCTION FROM ACURA YET FOR A FIX. VEHICLE IS NOW 3500 MILES AND ISSUES 2, 3, 4 STILL OCCURRING. *TR

CLASS ACTION COMPLAINT

(e)     2/10/15 THERE IS A VERY ROUGH UPSHIFT FROM SECOND TO THIRD, ON A LONG RIGHT HAND TURN WHEN TRANSMISSION IS COLD, IN THE MIDDLE OF THE TURN, POWER TO WHEELS DISAPPEARS AND REAPPEARS WHEN ROAD STRAITENS, TRANSMISSION/CAR SURGES FORWARD ON DOWN SHIFT 3 TO 2 (SOMETIMES). *TR

**2016 Acura TLX**

(a)     2/4/16 ACCELERATION FROM LOW GEARS REV RPM UP TO 6000 WHEN MOVING OUT OF A PARKING SPOT. WHEN GOING ONTO HIGHWAY SAME THING ANYTHING LOWER THAN 20 MPH HAS A HESITATION. NOT SURE WHAT MY OPTIONS ARE.

(b)     1. WHEN ACCELERATING FROM A STOP, THE TRANSMISSION OCCASIONALLY FEELS LIKE IT SLIPS INTO NEUTRAL. THE ENGINE RES BUT DOES NOT MOVE FORWARD FOR 1-2 SECONDS. 2. CAR DOWNSHIFTS INTO 1ST GEAR AND LURCHES FORWARD AFTER COMING TO A STOP. 3. TRANSMISSION SHIFTS VERY ABRUPTLY AND ROUGH DURING ALMOST ALL ACCELERATIONS.

**2016 Acura MDX**

(a)     7/13/15 THE 9 SPEED ZF TRANSMISSION HAS UNPREDICTABLE BEHAVIOR INCLUDING: DELAYED SHIFTING LEADING TO PAUSES IN POWER, DELAYED DOWN SHIFT DURING ATTEMPTS AT HIGHWAY SPEED ACCELERATION, JERKY SHIFTS, CAR REMAINS IN NEUTRAL WHEN SHIFTING FROM DRIVE TO REVERSE. VERY UNSAFE CONDITION DUE TO UNPREDICTABLE EFFECTS ON SPEED AND CAR CONTROL. THIS IS NOW A WIDESPREAD PROBLEM AFFECTING THE SAME TRANSMISSION IN JEEP, CHRYSLER, AND ACURA MODELS. THE ACURA TLX HAS PREVIOUSLY BEEN DESCRIBED WITH THIS PROBLEM. NOW THE SAME TRANSMISSION HAS BEEN INCLUDED IN

THE 2016 MDX WITH THE SAME OUT COME......UPDATED 10/20/15 *BF THE CONSUMER STATED THE TRANSMISSION WAS REPLACED. UPDATED 12/17/15.*JB

(b) 8/3/15 WHILE DRIVING, THE MDX SHIFTS INTO NEUTRAL AND CANNOT BE SHIFTED OUT OF NEUTRAL. THIS HAS OCCURRED ON THE HIGHWAY MULTIPLE TIMES. THE INFORMATION DISPLAY SHOWS FIRST EMISSIONS PROBLEM, THEN TRANSMISSION PROBLEM. ACURA HAS A TSB OUT FOR THIS B15-034, BUT WON'T APPLY IT UNTIL THE PROBLEM APPEARS. HAVING YOUR VEHICLE SHIFT INTO NEUTRAL IN A HIGH SPEED ENVIRONMENT IS EXTREMELY DANGEROUS. TSB B15-034 NEEDS TO BE A RECALL BEFORE THEIR MDX SHIFTS INTO NEUTRAL DRIVING ON THE HIGHWAY AND THEY BECOME IMMOBILIZED AND PEOPLE ARE KILLED AS A RESULT....UPDATED 09/22/15 *BF

80.     The Transmission Programming Defect was inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

81.     The existence of the Transmission Programming Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle.  Had they known that the Class Vehicles were equipped with defective transmissions, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for the vehicles.

82.     Reasonable consumers, like Plaintiffs, expect that a vehicle's transmission is safe, will function in a manner that will not pose a safety hazard, and is free from defects.  Plaintiffs and Class Members further reasonably expect that HMC and AHMC will not sell or lease vehicles with known safety defects, such as the Transmission Programming Defect, and will disclose any such defects to its consumers when it learns of them.  They did not expect HMC and AHMC to fail to disclose the Transmission Programming Defect to them and continually to deny the defects

1    exist.

2    **Honda Has Omitted and Failed to Disclose Information About the Transmission**

3    **Programming Defect**

4    83.    While they have been fully aware of the Defects in the Class Vehicles, AHMC and

5    HMC have actively omitted disclosure of existence and nature of the Transmission Programming

6    Defect from Plaintiffs and Class Members at the time of purchase, lease, or repair and thereafter.

7    Specifically, AHMC and HMC failed to disclose at and after the time of purchase, lease, or repair:

8          (g)    any and all known material defects or material nonconformity of the Class

9                Vehicles, including the Transmission Programming Defect relating to the

10                ZF 9HP Automatic Transmission;

11          (h)    that the Class Vehicles, including their ZF 9HP Automatic Transmission,

12                were not in good in working order, were defective, and were not fit for their

13                intended purpose, and specifically that the ZF 9HP Automatic

14                Transmission would cause the Class Vehicles to have rough and delayed

15                shifting, loud noises during shifting, harsh engagement of gears, sudden,

16                harsh accelerations and decelerations, and sudden loss of power; and

17          (i)    that the Class Vehicles and their ZF 9HP Automatic Transmission were

18                defective, despite the fact that AHMC and HMC learned as early as 2014

19                of the Transmission Programming Defect through high failure rates,

20                customer complaints, and other internal sources discussed in this

21                Complaint.

22    84.    As a result of the Transmission Programming Defect, AHMC received many

23    complaints regarding the Class Vehicles' ZF 9HP Automatic Transmissions, including customers

24    experiencing rough, delayed, or sudden shifting or failure to shift, grinding or other loud noises

25    during shifting, harsh engagement of gears, sudden or harsh accelerations/decelerations, and

26    sudden loss of power.

27    85.    Despite the TSBs discussed above, consumers such as Plaintiffs continued to

28    experience problems with their vehicles, including rough, delayed, or sudden shifting or failure

to shift, grinding or other loud noises during shifting, harsh engagement of gears, sudden or harsh accelerations/decelerations, and sudden loss of power, which necessitate additional repairs to the ZF 9HP Automatic Transmission.  This shows that the TSBs and service campaigns were insufficient to repair the Transmission Programming Defect and that the TSBs themselves are only partial disclosures of issues with the ZF 9HP Automatic Transmission.

86.    AHMC and HMC should have revealed the existence of the Transmission Programming Defect and their symptoms in marketing, such as press releases, public comments, commercials, and vehicle brochures, in a windshield sticker (for example, NHTSA requires that Monroney Stickers be affixed to the windows of each vehicle sold in the United States), and through the authorized dealerships and their personnel who discussed these vehicles with Plaintiffs and members of the Class prior to purchase.  Each of these avenues are ways in which Plaintiffs and other consumers collect information in order to make a decision to purchase or lease a vehicle.  Each of these avenues of disclosure which specifically reference the transmission or the driving capability of the vehicle should have also revealed the existence and symptoms of the Transmission Programming Defect at the same time – prior to the sale or lease of the vehicle. Had they done so, Plaintiffs and members of the Class would have seen and/or heard the disclosures.  Instead, these avenues do not reference the Transmission Programming Defect or their symptoms, in order to induce Plaintiffs and consumers to purchase the Class Vehicles by failing to mention the Defects.

87.    Discovery will show that the repairs outlined by the various TSBs issued by AHMC and HMC also failed to resolve the Transmission Programming Defect.  These TSBs also should have directly acknowledged the existence of the Transmission Programming Defect and that they do not have a permanent repair, but they do not.

88.    When consumers such as Plaintiffs presented the Class Vehicles to an authorized Honda dealer for problems with the vehicle's ZF 9HP Automatic Transmission, rather than repair the problems under warranty, Honda dealers either informed consumers that their vehicles were functioning properly, or "as designed," or performed work or software updates that merely masked the defects.  In this way, AHMC and HMC keep warranty repair costs lower than they

1    otherwise would be.

2        89.     To this day, AHMC and HMC still have not notified Plaintiffs and Class Members

3    that the Class Vehicles suffer from the Transmission Programming Defect that cause the ZF 9HP

4    Automatic Transmission to malfunction, nor have they offered a permanent repair to Plaintiffs

5    and Class Members.

6                                    **CLASS ACTION ALLEGATIONS**

7        90.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others

8    similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure

9    23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy,

10   predominance, and superiority requirements of those provisions.

11       91.     The Class and Sub-Class are defined as:

12

13           **Class**:  All individuals in the United States who purchased or
             leased any Honda vehicle equipped with a 9-speed Automatic
14           Transmission.

15           **California Sub-Class**: All individuals who purchased or leased
             any Honda vehicle equipped with a 9-speed Automatic
16           Transmission in the State of California.

17           **CLRA Sub-Class**: All members of the California Sub-Class who
             are "consumers" within the meaning of California Civil Code §
18           1761(d).

19       92.     Excluded from the Class and Sub-Classes are: (1) Defendants, any entity or

20   division in which Defendants has a controlling interest, and its legal representatives, officers,

21   directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's

22   staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an

23   appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a

24   result of the Transmission Programming Defect alleged herein.  Plaintiffs reserve the right to

25   amend the Class and Sub-Class definitions if discovery and further investigation reveal that the

26   Class and Sub-Class should be expanded or otherwise modified.

27       93.     There is a well-defined community of interest in the litigation and each subclass is

28   readily ascertainable.

94.     <u>Numerosity</u>:  Although the exact number of prospective class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of prospective class members' claims in a single action will provide substantial benefits to all parties and to the Court.  The prospective class members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the departments of motor vehicles of the various states.

95.     <u>Typicality</u>: The claims of the representative Plaintiffs are typical of the claims of all prospective class members in that the representative Plaintiffs and the prospective class members purchased and leased a Class Vehicle designed, manufactured, and distributed by Honda and equipped with a defective ZF 9HP Automatic Transmission.  The representative Plaintiffs, like all prospective class members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the defective transmission.  Furthermore, the factual bases of Honda's misconduct are common to all prospective class members and represent a common thread resulting in injury to all prospective class members.

96.     <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and the prospective class members that predominate over any question affecting individual prospective class members.  These common legal and factual issues include the following:

(a)     Whether Class Vehicles contain defects relating to the ZF 9HP Automatic Transmission;

(b)     Whether the defects relating to the ZF 9HP Automatic Transmission constitute an unreasonable safety risk;

(c)     Whether Defendants knew about the defects relating to the ZF 9HP Automatic Transmission and, if so, how long Defendants has known of the defect;

(d)     Whether the defective nature of the ZF 9HP Automatic Transmission constitutes a material fact;

(e)     Whether Defendants has a duty to disclose the defective nature of the ZF 9HP Automatic Transmission to Plaintiffs and prospective class members;

(f)    Whether Defendants knew of the defects relating to the ZF 9HP Automatic Transmission before selling and leasing Class Vehicles to prospective class members;

(g)    Whether Defendants should be declared financially responsible for notifying all prospective class members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective ZF 9HP Automatic Transmission;

(h)    Whether Defendants is obligated to inform prospective class members of their right to seek reimbursement for having paid to diagnose, repair, or replace the defective ZF 9HP Automatic Transmission; and

(j)    Whether Defendants breached consumer protection statutes under the laws of the state of California; and

(k)    Whether Defendants breached the implied warranty of merchantability under the laws of the state ofCalifornia.

97.    <u>Adequate Representation</u>:  Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intends to prosecute this action vigorously.

98.    <u>Predominance and Superiority</u>:  Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will

conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

### FIRST CAUSE OF ACTION

**(Violation of California's Consumers Legal Remedies Act,**

**California Civil Code §§ 1750, et seq.)**

**(On Behalf of the CLRA Sub-Class)**

99.     Plaintiffs incorporate by reference the allegations contained in the preceding sections of the complaint.

100.     Plaintiffs Kevin and Anita Moore bring this cause of action on behalf of themselves and the Class, or, alternatively, the CLRA Sub-Class, against AHMC and HMC.

101.     AHMC and HMC are "persons" as defined by California Civil Code § 1761(c).

102.     Plaintiffs Moore and CLRA Sub-class Members are "consumers" within the meaning of California Civil Code § 1761(d), because they purchased or leased their Class Vehicles primarily for personal, family, or household use.

103.     By failing to disclose the defective nature of the ZF 9HP Automatic Transmissions from Plaintiffs Moore and prospective Class Members, AHMC and HMC violated California Civil Code § 1770(a), as they represented that the Class Vehicles and their ZF 9HP Automatic Transmissions had characteristics and benefits that they do not have and represented that the Class Vehicles and their ZF 9HP Automatic Transmissions were of a particular standard, quality, or grade when they were of another. See Cal. Civ. Code §§ 1770(a)(5) & (7).

104.     AHMC and HMC's unfair and deceptive acts or practices occurred repeatedly in AHMC and HMC's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

105.     Both AHMC and HMC knew that the Class Vehicles and their ZF 9HP Automatic Transmissions suffered from inherent defects, were defectively designed, and were not suitable for their intended use.

106.     Because of their reliance on AHMC and HMC's omissions, owners and/or lessees of the Class Vehicles, including Plaintiffs Moore, suffered an ascertainable loss of money,

property, and/or value of their Class Vehicles. Additionally, because of the Transmission Programming Defect, Plaintiffs Moore and Class Members were harmed and suffered actual damages in that the Class Vehicles' ZF 9HP Automatic Transmissions are substantially certain to fail before their expected useful life has run.

107.    AHMC and HMC were under a duty to Plaintiffs Moore and Class Members to disclose the defective nature of the ZF 9HP Automatic Transmissions and/or the associated repair costs because:

(a)    AHMC and HMC were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' ZF 9HP Automatic Transmissions;

(b)    Plaintiffs Moore and Class Members could not reasonably have been expected to learn or discover that their ZF 9HP Automatic Transmissions had a dangerous safety defect until it manifested; and

(c)    AHMC and HMC knew that Plaintiffs Moore and Class Members could not reasonably have been expected to learn of or discover the safety defect.

108.    In failing to disclose the defective nature of ZF 9HP Automatic Transmissions, AHMC and HMC knowingly and intentionally failed to disclose material facts and breached their duty not to do so.

109.    The facts AHMC and HMC failed to disclose to Plaintiffs Moore and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less. Had Plaintiffs Moore and Class Members known that the Class Vehicles' ZF 9HP Automatic Transmissions were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

110.    Plaintiffs Moore and Class Members are reasonable consumers who do not expect the ZF 9HP Automatic Transmissions installed in their vehicles to exhibit problems such as the Transmission Programming Defect. This is the reasonable and objective consumer

expectation relating to a vehicle's ZF 9HP Automatic Transmissions.

111.    Because of AHMC and HMC's conduct, Plaintiffs Moore and Class Members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Transmission Programming Defect.

112.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiffs Moore and Class Members suffered and will continue to suffer actual damages.

113.    Plaintiffs Moore provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). If, within 30 days, Defendants fails to provide appropriate relief for their violations of the CLRA, Plaintiffs Moore will amend this Complaint to seek monetary, compensatory, and punitive damages, in addition to the injunctive and equitable relief that they seek now on behalf of themselves and the CLRA Sub-Class

## SECOND CAUSE OF ACTION

### (Violation of California Business & Professions Code § 17200, *et seq.*)

### (On Behalf of the California Sub-Class)

114.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

115.    Plaintiffs bring this cause of action on behalf of themselves and the Class, or, in the alternative, the California Sub-Class.

116.    As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail before their expected useful life has run.

117.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

118.   Plaintiffs and Class Members are reasonable consumers who do not expect their transmissions to exhibit problems such as: rough, delayed, or sudden shifting or failure to shift; grinding or other loud noises during shifting; harsh engagement of gears; sudden or harsh accelerations/decelerations; and sudden loss of power.

119.   Defendants knew the Class Vehicles and their transmissions suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

120.   In failing to disclose the defects with the transmission, Defendants have knowingly concealed material facts and breached their duty not to do so.

121.   Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles and their transmissions:

      (l)   Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions;

      (m)   Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and their transmissions; and

      (n)   Defendants actively concealed the defective nature of the Class Vehicles and their transmissions from Plaintiffs and the Class.

122.   The facts regarding the Transmission Defect that the Defendants concealed from, or failed to disclose to, Plaintiffs and Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles. Had they known that the Class Vehicles' ZF 9HP Automatic Transmissions were defective and posed a safety hazard, then Plaintiffs and Class Members would not have purchased or leased Class Vehicles equipped with ZF 9HP Automatic Transmissions or would have paid less for them.

123.   Defendants continued to conceal the defective nature of the Class Vehicles and their transmissions even after Class Members began to report problems. Indeed, Defendants continues to cover up and conceal the true nature of the problem.

124.   Defendants' conduct was and is likely to deceive consumers.

125.   Defendants' acts, conduct and practices were unlawful, in that they constituted:

    (a)   Violations of the California Consumers Legal Remedies Act;

    (b)   Violations of the Song-Beverly Consumer Warranty Act;

    (c)   Breach of Express Warranty

126.   By their conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

127.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

128.   As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

129.   Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and the Class pursuant to §§ 17203 and 17204 of the Business & Professions Code.

## THIRD CAUSE OF ACTION

**(Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq*.)**

**(On Behalf of the California Sub-Class)**

130.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

131.   Plaintiffs Kevin and Anita Moore bring this cause of action on behalf of themselves and the Class, or, in the alternative, the California Sub-Class.

132.   AHMC and HMC were at all relevant times the manufacturer, distributors, warrantors, and/or sellers of the Class Vehicles. AHMC and HMC knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

133.   AHMC and HMC provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purpose for which they were sold. However, the Class Vehicles are not fit for their

ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their ZF 9HP Automatic Transmissions suffered from an inherent defect at the time of sale and thereafter.

134.   AHMC and HMC impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured and distributed by HMC and supplied, distributed, and/or sold by AHMC were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

135.   Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles exhibit the Transmission Programming Defect.

136.   As a result of AHMC and HMC's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Programming Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles' transmission components are substantially certain to fail or require replacement or repair, before their expected useful life has run.

137.   AHMC and HMC's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

**FOURTH CAUSE OF ACTION**

**(For Breach of Express Warranty under California Law)**

**(On Behalf of the California Sub-Class)**

138.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

139.   Plaintiffs Kevin and Anita Moore bring this cause of action on behalf of

1    themselves and on behalf of the Class, or, alternatively the California Sub-class, against AHMC.

2        140.    AHMC provided all purchasers and lessees of the Class Vehicles with an express

3    warranty described *infra*, which became a material part of the bargain. Accordingly, Honda's

4    express warranty is an express warranty under California law.

5        141.    The ZF 9HP Transmissions were manufactured and/or installed in the Class

6    Vehicles by HMC and are covered by the terms of the express warranty.

7        142.    In a section entitled "What is Covered," AHMC's express warranty provides in

8    relevant part that "This warranty covers repairs and adjustments needed to correct defects in

9    materials or workmanship of any part supplied by Honda." Likewise, AHMC's Powertrain

10   Warranty provides in relevant part that "This warranty covers repairs needed to correct defects in

11   materials or workmanship of any component listed below and in the next column and supplied by

12   Honda." The "transmission and transaxle" are among the parts covered by the Powertrain

13   Warranty.

14       143.    According to AHMC, the Basic Warranty coverage for Honda models "is for 36

15   months or 36,000 miles, whichever occurs first…" The Powertrain warranty coverage "is for 60

16   months or 60,000 miles, whichever occurs first." The Powertrain warranty coverage "is for 72

17   months or 70,000 miles, whichever occurs first."

18       144.    AHMC breached the express warranties by selling and leasing Class Vehicles with

19   ZF 9HP Automatic Transmissions that were defective, requiring repair or replacement within the

20   warranty period, and refusing to honor the express warranty by repairing or replacing, free of

21   charge, the ZF 9HP Transmissions. In addition, when AHMC did agree to pay a portion of the

22   costs, AHMC nevertheless breached the express warranty by simply replacing defective ZF 9HP

23   Transmissions with similarly defective ZF 9HP Transmissions, thus failing to "repair" the defect.

24       145.    Plaintiffs Moore were not required to notify AHMC of the breach or were not

25   required to do so because affording AHMC a reasonable opportunity to cure its breach of written

26   warranty would have been futile. AHMC was also on notice of the defect from complaints and

27   service requests it received from Class Members, from repairs and/or replacements of the ZF 9HP

28   Transmissions, and from other internal sources.  However, Plaintiffs Moore provided notice of

the breach of express warranty, dated September 20, 2023, by AHMC to AHMC prior to the filing of this Complaint.

146.    As a direct and proximate cause of AHMC's breach, Plaintiffs Moore and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs Moore and the other Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

147.    Plaintiffs Moore and the other Class Members are entitled to legal relief against Honda, including actual damages, consequential damages, attorneys' fees, costs of suit, and other relief as appropriate.

**FIFTH CAUSE OF ACTION**

**(Breach of Express Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq.*)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes**

**Against Defendants)**

148.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

149.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Class against Defendants.

150.    Defendants provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain.

151.    The ZF 9HP Automatic Transmission and its component parts were manufactured and/or installed in the Class Vehicles by Defendants and are covered by the express warranty.

152.    In a section entitled "What is Covered," AHMC's express warranty provides in relevant part that "This warranty covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Honda." Likewise, AHMC's Powertrain Warranty provides in relevant part that "This warranty covers repairs needed to correct defects in materials or workmanship of any component listed below and in the next column and supplied

by Honda." The "transmission and transaxle" are among the parts covered by the Powertrain Warranty.

153.    Defendants breached the express warranties by selling and leasing Class Vehicles with Headlights that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the Headlight and its component parts. Defendants have failed to "repair" the defects as alleged herein.

154.    Plaintiffs were not required to notify Defendants of the breach or were not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants were also on notice of the defect from complaints and service requests they received from Class Members, from repairs and/or replacements of the Headlight, and from other internal sources.

155.    Plaintiffs also provided notice to Defendants of their breach of warranty claims under the MMWA by letter dated September 20, 2023.

156.    As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs and the other Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

157.    Plaintiffs and the other Class members are entitled to legal and equitable relief against Defendants, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**SIXTH CAUSE OF ACTION**

**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq.*)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes**

**Against Defendants)**

158.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

159.     Plaintiffs bring this cause of action on behalf of themselves and the Class against Defendants.

160.     The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

161.     Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

162.     Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

163.     Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their ZF 9HP Automatic Transmissions manufactured, supplied, distributed, and/or sold by Defendants would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their ZF 9HP Automatic Transmissions would be fit for their intended use while the Class Vehicles were being operated.

164.     Contrary to the applicable implied warranties, the Class Vehicles and their ZF 9HP Automatic Transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design and materials of their ZF 9HP Automatic Transmissions.

165.     Defendants' breach of implied warranties has deprived Plaintiffs and Class members of the benefit of their bargain.

166.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

167.     Defendants have been afforded a reasonable opportunity to cure their breach, including when Plaintiffs and Class members brought their vehicles in for diagnoses and ZF 9HP Automatic Transmission repair.

CLASS ACTION COMPLAINT

168.     As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiffs and Class members sustained and incurred damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

169.     As a result of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class members have incurred damages.

170.     Plaintiffs also provided notice to Defendants of its breach of warranty claims under the MMWA by letter dated September 20, 2023.

**SEVENTH  CAUSE OF ACTION**

**(For Fraud by Omission or Fraudulent Concealment)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)**

171.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

172.     Plaintiffs bring this cause of action on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendants.

173.     Defendants knew that the Class Vehicles suffered from an inherent Transmission Programming Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

174.     Defendants concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

175.     Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

    a.     Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

    b.     The omitted facts were material because they directly impact the safety of the Class Vehicles;

c.    Defendants knew the omitted facts regarding the Transmission Programming Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

d.    Defendants made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e.    Defendants actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

176.    The facts concealed or not disclosed by Defendants to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendants' Class Vehicles or pay a lesser price for them. Whether a vehicle's transmission is defective is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

177.    Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs and Class Members' purchase or lease of Defendants' defective Class Vehicles.

178.    Defendants continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

179.    As a direct and proximate result of Defendants' misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

180.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich

Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof

## EIGHTH CAUSE OF ACTION

### (For Unjust Enrichment)

### (On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)

181.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

182.    Plaintiffs bring this cause of action on behalf of themselves and the Class.

183.    As a direct and proximate result of Honda's failure to disclose known defects, Honda has profited through the sale and lease of the Class Vehicles. Although these vehicles are purchased through Honda's agents, the money from the vehicle sales flows directly back to Honda.

184.    Additionally, as a direct and proximate result of Honda's failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Honda.

185.    Honda has been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Honda's profits when said money should have remained with Plaintiffs and Class Members.

186.    As a result of Honda's unjust enrichment, Plaintiffs and Class Members have suffered damages.

### RELIEF REQUESTED

187.    Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter judgment against Defendants, as follows:

(a)    An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representative of the Class, and designating the undersigned as Class Counsel;

(b)     An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(c)     Any and all remedies provided pursuant to the Song-Beverly Act, including California Civil Code section 1794 and for breach of the implied warranty merchantability under the laws of the state of California;

(d)     Any and all remedies provided pursuant to the consumer protection statutes of the state of California alleged *supra;*

(e)     An award of attorneys' fees and costs, as allowed by law;

(f)     An award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5;

(g)     An award of pre-judgment and post-judgment interest, as provided by law;

(h)     Leave to amend the Complaint to conform to the evidence produced at trial; and

(i)     Such other relief as may be appropriate under the circumstances.

<strong>DEMAND FOR JURY TRIAL</strong>

188.     Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated: September 29, 2023         Respectfully submitted,

Capstone Law APC

By: /s/ Laura E. Goolsby
     Tarek H. Zohdy
     Cody R. Padgett
     Laura E. Goolsby

BERGER MONTAGUE PC
Russell D. Paul
(*pro hac vice forthcoming*)
Amey J. Park
(*pro hac vice forthcoming*)
Abigail J. Gertner
(*pro hac vice forthcoming*)

*Attorneys for Plaintiffs*